Case 22-1522, USA v. Semaj Williams. Argument not to exceed 15 minutes per side. Mr. Nam Fakudza, you may proceed for the appellate. Good morning, your honors. May it please the courts, Takure Nam Fakudza, on behalf of Mr. Williams and with the court's permission, I'd like to reserve three minutes for rebuttal. My time before the court, I will explain two primary points. The first one is that there was insufficient particularized suspicion to justify the district court's conclusion that the contraband found in Ms. Ellis' car belonged to Mr. Williams. The second is that Officer Morgan and his cohorts engaged in a prolonged detention which went well beyond the amount of time reasonably necessary for the very simple mission of issuing a traffic citation. With regard to the first point, as this court is undoubtedly aware, the district court focused primarily on seven factors and a majority of those factors had nothing to do with Mr. Williams. Specifically, the time of the stop, the driver's lack of a license, the driver's lack of insurance, lies that the driver told to Officer Morgan, Officer Howey, and others, and the driver's pit stop at a supposed drug house. And finally, we get to Mr. Williams' supposed nervousness and his designation as what Officer Morgan described as a priority offender. That he had gone into the house that was a known drug house, according to the officer, right? I mean, she told him, the driver told the officer that Williams was the person who went in the house. Is that right? Self-serving, that is what Ms. Ellis told Officer Morgan, but again, no corroboration whatsoever. Even after there were half a dozen officers at a house three blocks away, there was never any corroboration. These were self-serving statements from an individual who began to change his story. Now, this issue goes to sentencing, is that right? Is that why you're raising this as to the sentencing quantity or is there more to it in terms of its import in this case? No, Your Honor. The sentencing, if I'm following your question, Mr. Williams was the only person out of the four people in the car who was arrested and charged. So if we agree with you on this argument, what follows in terms of the district court's decision making? The drugs are suppressed and then count one goes away. Count one, that's the one about the amounts he supposedly possessed on his person. That's correct, Your Honor. That got dismissed already, didn't it? There was a conspiracy count. That's way more methamphetamine than we're talking about in the car. Correct, Your Honor. That's Schnellenberger and all these people buying from him for a long period of time, they said. So how would this car search affect the validity of that count? It does speak, yes, arguably it does speak to sentencing, Your Honor, yes. Yeah, I mean it goes to the quantity because they threw this 50 grams in with the 17,000 grams, but okay. Well, I just wanted to understand where this was kind of headed. Yes, Your Honor. So with regard to this supposed priority offender designation, again, Mr. Williams was the only person who did not have an active warrant. He was the only person who did not commit a crime in front of the officers, yet as I mentioned, he was the only person who was carted away. And in fact, when I pressed Officer Morgan at the suppression hearing on cross-examination about this priority offender designation, he admitted that in all the incidents where officers responded to incidents even on the street that he lived on, that Mr. Williams was not involved in any of them whatsoever. Paris Black, the individual who was next to Mr. Williams, who had a backpack on his legs and was fidgeting and would not make eye contact, that could have held a contraband and even a weapon. Ultimately, Officer Morgan learned through investigation that Mr. Black had a warrant for narcotics, and he actually had marijuana found on this person. Now I admit that in Michigan, because of his age, it was a legal amount for him to have. But again, everything points away from Mr. Williams. Actually, the driver of the car lied to the officer about where she was coming from and what she had been doing. She professed not to know the names of the occupants of the car. I guess that would include your client. I mean, there's enough suspicious circumstances that it would seem appropriate for the officer to have investigated all the occupants of the car, don't you think? Your Honor, at that juncture, Ms. Ellis had been pulled out of the car, and the officer had already determined that she didn't have a valid license, did not have insurance, and ultimately that she had an open warrant. So continuing, after he had already confirmed this information, is where I think we start veering into the Rodriguez territory. But in Joshua v. DeWitt, this court held that the knowledge of a defendant's criminal history, when combined with minimal factors such as nervousness and illogical travels, was insufficient to establish reasonable suspicion. So where they may have gone really does not justify that conclusion, if I'm following the court's question. Is that responsive to the court's question, Your Honor? Well, that's your answer. You can continue if you like. With regard to the drug house, again, on cross-examination, we established that, again, nobody ever went back to verify this information that this was a supposed drug house. And again, these were self-serving statements by a driver who already was incredible and herself was seen committing, by an officer, multiple officers, criminal activity. And we do not have, at that point, the sort of individualized suspicion that the Supreme Court determined is indispensable for purposes of the Fourth Amendment in the city of Indianapolis v. Edmond. Instead, Officer Morgan and his cohorts just stacked assumption upon assumption upon assumption. So again, at every point, I would point out also that the body-worn camera footage shows that this car was, there was a lot of stuff in there. Clothes, bags, and all sorts of things. The government also presented no evidence whatsoever of people seating arrangements. So we don't know if they played music with chairs, how long these people had been together, so there's absolutely no telling who these drugs belonged to. There was no forensic link, no DNA, nothing connecting Mr. Williams to those drugs. And this nervousness, again, based on decisions from this court, does not, again, rise to that level of suspicion. Well, I mean, I don't know how much you want to talk about the car encounter, but your client's got a real problem with the amount of methamphetamine that's attributed to him. You do challenge that, I guess. I just wonder if you want to talk about that at all. I mean, how come, I mean, you want to reject Schellenberger's testimony about the amount he was buying from your client and just rely on the other guy, MacMillan, or whatever his name was? Is that his name? Yeah. Yeah, MacMillan. Yes, Your Honor. I mean, how, why? I mean, they were both buying from him. I think your client admitted in his plea that they were both buying from him. So how do you disaggregate the Schellenberger amounts, which I think is what you're arguing in your brief? Yes, Your Honor. The, again, I can't say with mathematical precision exactly how much it is. But even within their own statements, those two gentlemen are inconsistent with regard to the frequency, when they bought, and where. But they're different buyers, so they may have different patterns, right? Their own statements, Your Honor, are what I'm saying don't match. And if these two gentlemen who supposedly, on occasion, both went and bought from Mr. Williams, if their own... Together, you mean? Are you saying they were acting together? They'd go together to buy the drugs? On occasion, Your Honor. There were some evidence that suggested that that is what happened on occasion. But even those statements were not consistent. The pre-sentence report reveals some amounts that these two gentlemen claimed that they bought from Mr. Williams, and the numbers just don't match, Your Honor. So I think in these instances, when you are trying to prove that you're cooperative, the more you can establish, right, to throw another guy under the bus, the better. That's every case. And the district judge has to make a finding about what he or she believes. And so we're reviewing just for clear error. And I don't know. I just struggle to see what the court's clear error was. Your Honor, I would just point out that the incentive to exaggerate is at the peak level at this juncture. Because already having pled at that juncture, they're trying to buy themselves time off their sentences. And they do that by pointing the finger at the one person who has not yet been indicted at that juncture. That they're making all these claims about the amount of drugs that they supposedly bought. Okay. Well, while we're on this matter of sentencing, there's the issue of whether the sentence was procedurally unreasonable, because the judge may not have addressed all of the basis for arguments for leniency by your client. Do you have anything to say about that? Yes, Your Honor. Again, I'm not a social scientist, but from jurisprudence from the United States Supreme Court, we know now that, at least for males, perhaps myself included, that the prefrontal cortex is not fully. It can take a while. I told my daughter, don't date any guys until they're 25. Trust me. I hope she listens to that, Your Honor. But I see my time is running short, Your Honor. But he was a young man. I mean, you don't have to say more, but if you have more, you can answer. Certainly. The environment within which Mr. Williams was raised, single mother who tried her best, and he unfortunately started using to deal with his circumstances at an age when his brain was very malleable. And again, there were a lot of efforts on his part, even after he was in custody. He obtained his GED. He was not a problem at all for the folks at the Nuevo County Jail. I see my time is up, but I will rely on my briefing, Your Honor, with regard to the other mitigating circumstances. Very well. Thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court. I'm Stephanie Carroll, and I'm appearing on behalf of the United States. My colleague raised two issues at the beginning of his argument, I think the first of which is pretty easily dispelled by this Court. He said there was insufficient proof that the methamphetamine found on the floorboard right where his client had been sitting could be attributed to Mr. Williams. Your Honors, that's a trial question. That's not a question for this Court to review. Those arguments about it could have been someone else's or someone else could have been sitting there, those are arguments that should have been made at the trial level. Instead, Mr. Williams pled guilty to the methamphetamine conspiracy as well as the methamphetamine at his feet. So at this point- Did he plead to possessing that meth as well, the stuff that was at his feet, or just dealing to these two other guys? He pled to count one, which was the conspiracy, but as part of the factual basis, I believe admitted those- Is there a page number you can give us for the proposition that he admitted at open court what you're disputing here? I don't necessarily have the page ID in front of me. I know that the factual basis, however, of the plea agreement talked about not only his dealings with Mr. McMillan and Mr. Schellenberger, but also that he continued to deal himself and made that admission. And if you look at the facts of what happened on the 13th, it's clear that he was continuing to deal himself based on the text messages that were taken from the phone. But regardless, that really is a trial issue, whether it was his meth or not his meth. Well, the court made a finding, right? The court did as a matter of sentencing. So we review that for clear error. It's not like it's out of bounds for this court to look at that. Fair enough. And on the sentencing issue, though, I would point out that, first of all, that amount of methamphetamine, even if it's taken out of the sentencing calculation, does not actually change the guideline analysis that the district court did. And I believe that's the- So that's actually a harmless error in that particular case, and that's the Woodside case from this court, that errors that don't change the guidelines are ultimately harmless. I guess the district court, in making that finding, the court made that finding in the context of sentencing. Is that correct? That's correct, Your Honor. And so in making that finding in the context of sentencing, the court, of course, could consider his admissions that he had been dealing a great deal of methamphetamine to all these people in determining whether that might be his meth in the back of the car. Absolutely. And the district court could also credit the statements that were made in the PSR about the encounter on the 13th as well. And so the district court did have sufficient evidence in front of it to make those factual determinations by the preponderance standard that would have been applied at sentencing on that issue. The second issue my colleague raised was the traffic stop and the elongation of the traffic stop. The officer's actions in this particular case were reasonable from the beginning. He effectuated a lawful traffic stop for a traffic violation. He had been surveilling the vehicle for a while before he made that traffic stop. He saw the vehicle leave a known drug residence, and he testified, and the district court credited his testimony, that it wasn't just, I sort of know that this is a drug house. He said another police officer had actually done a traffic stop a week or two prior to that and had actually recovered drugs during that traffic stop, and the person that had the drugs attributed them to that very house. So he sees the vehicle leave the drug house, doesn't use a turn signal, then runs the license plate, doesn't have insurance. So there's no real debate that the traffic stop itself is sufficiently supported by the evidence. The timeline then going forward, the officer diligently pursues the mission of the traffic stop. From the moment he pulls that car over until he develops reasonable suspicion to continue that particular detention, he reasonably, he uses that time to diligently investigate the traffic stop mission. He gets the driver's license and registration. He then waits at the car further to obtain her insurance information, which ultimately she's not able to provide because the vehicle wasn't insured. He then goes and checks all of that, and his patrol vehicle comes back that she doesn't have a license in addition to the insurance problem, and she has an outstanding warrant. So at that point, he goes back to the driver. Remarkably, he lets this car drive away. I mean, that is, it may not matter much, but how does he let this car drive away? It's a completely fair question. I'm not sure to the ultimate legal analysis that it matters, but it is a fair question. Some of that in context, Your Honor, we're talking about March of 2021, and if you listen to the body camera recordings, he actually tells another officer, the jail's not taking anyone. And so as a result of that, he's not in a position where he can effectuate a misdemeanor warrant on the driver at that particular time. In fact, he doesn't arrest Mr. Williams on the scene for the methamphetamine given the fact that the jail wasn't taking people at that time. So he has to make a decision about the driver as to whether he's going to let her drive the car off herself or have someone else drive it off, and those are the reasons that he asks the travel questions that he ultimately does in this particular case. What about your friend's argument in his briefing today that the district judge did not adequately address the defendant's arguments regarding some mitigating circumstances? You're talking about the sentencing now again, Your Honor? I would respectfully disagree with my friend and colleague in that particular point. Procedural reasonableness sort of goes to the structure of the sentencing. The court here calculated the guidelines, and he did consider the 3553A factors. He said, on the record, I've read all of the parties' briefings, which included an extensive analysis by my colleague about the 3553A factors. He then heard from the parties and engaged with the parties about their arguments. So when my colleague was making his sentencing argument, if the judge had questions or wanted to clarify, he actually engaged in a colloquy with Mr. Nayem Fakouza in order to obtain that information. So he went through the proper process and then made findings based on that. And the clerk case indicates that the record has to show that the judge considered all of the arguments. And it does in this case. He talks about considering Mr. Williams' record, the 27 arrests in 14 years, the extensive amount of methamphetamine, his criminal history, his association with firearms, but also his family situation and some of the other issues that were raised by my colleague at sentencing. Didn't Williams, at this hearing, the court asked if I've answered all your arguments? He did. Or addressed them, right? He did. He asked the Bostick question at the end of counsel that have I addressed all of your arguments sufficiently. And the answer was yes. Correct. Okay. He then followed up and said are there any further objections other than the guideline objections that had already been raised. And, again, the answer was there were no other objections to the sentence, which is why in this particular issue we're under sort of plain error review in this particular case. But the court did consider everything. And ultimately Mr. Williams' counsel's argument comes down to the judge should have weighed the factors differently. And Sexton sort of says that's not necessarily reviewable. That, you know, the district court is able to use its discretion to weigh those factors. And it did here. And it placed more emphasis on the extensive arrest record of the defendant, the extent of the methamphetamine, the indication from the Facebook and phone photos that he was connected to firearms, his criminal history. That's where the district court put its emphasis in crafting the sentence. But that is certainly well within the district court's discretion and certainly doesn't constitute plain error before this court. So I understand that the Bostic question was asked. And there was a pretty extensive colloquy here. But do we know whether the district judge considered these couple of other factors, their caretaking responsibility that the defendant said he had for his mother, this whole issue of grain not being fully developed, and then the absence of his father in his life during his childhood. Those are items that he has mentioned that the district court did not consider. The court in announcing sentence did talk about Mr. Williams' family circumstances as part of that sentence. He also indicated that he had read all of the filings, all of which those arguments were made in the papers that were submitted, including the development of the brain. I agree with Your Honor, maybe your daughter shouldn't date before 25. In light of men's brain development, as my colleague pointed out. But I do... Applehead phase. You know, we all have them. At least in my experience. But the district court did address it. I don't think, I think... Well, the court addressed it in the sense that the court addressed the family matters had before this information, but it's not, apparently did not specifically articulate in court that I've considered your, you know, your absence of your father, I've considered the fact that you are needed to take care of your mother and that you've had whatever the issue might be as to just age or otherwise as to his, you know, brain development. We just have to assume that the district court would have considered that. The district court didn't go through a bullet pointed list, as Your Honor just did, which I think is a fair characterization of the record. However, you know, the court did indicate, you know, look, I've read and considered all of the filings, all of those other things. And Clark, again, says you don't have to say every single argument. This is why I accept it or reject it. It doesn't have to be every single solitary argument that was raised. Otherwise, we'd be having sentencing hearings that last hours in every case because there's always multiple arguments on both sides of the equation. But I think there is sufficient evidence under a plain error standard to find that the district court adequately exercised its discretion in imposing sentencing in this matter. There are no other questions? Apparently not. Thank you very much, Your Honor. Thank you. Senator Barlow. Thank you, Your Honors. Very briefly, in United States v. Pittman, that opinion suggests that it's not enough to just say, glossingly, I considered it. It's the substance. It matters what it is. Putting meat on the bones is what did not happen here, to Your Honor's point. Go ahead. There was an opportunity when the judge asked, do you have anything else or something to that effect, to say, you know, has the court considered X, Y, and Z specifically? It appears to me that maybe that did not occur. Was it raised directly, if I'm correct about the record? Not in the manner that, Your Honor. Okay. So maybe you can tell me what happened. Well, Your Honor, having already spoken at length about his efforts, Mr. Williams' efforts in the Nuego County Jail, how he had not caused a problem, and I did describe how he was raised by a single mother. So that was raised by a single mother? Yes, Your Honor, and how his circumstances were very challenging ones. None that I think anybody would volunteer to be raised in. And your concern is that you raised that issue and the judge just did not specifically address it? That and others, yes, Your Honor. And the others being the brain issue and the caretaking of his mother issue? Yes, and we had submitted extensive documentation about her challenges, and, again, the court just said, eh, I read it, moving on. But, I mean, he did ask you, Judge Maloney, at the very end of the hearing, are you satisfied I've addressed all of your arguments on the record? And the response was yes. I mean, that's exactly what we're talking about here, right? I mean, that's the time to say, Your Honor, you haven't addressed, as Judge Cole said, A, B, and C,  and so now, I mean, he was told that he had addressed everything. So, I mean, it makes it hard to do much. I understand, Your Honor. I won't spend a whole lot of time on the vehicle stop, but I would point out, again, Mr. Williams was the very first person pulled out, and then Rodriguez. It was only seven minutes that was violative in terms of the length of the mission, and here it was 22 minutes before the drug dog arrived. But, again, the math just doesn't add up, and Mr. Schellenberger and his cohort had every reason to just exaggerate, and the math doesn't add up, Your Honor. In your mind, at what point should this traffic stop have ended? It was, I think, 23 or more minutes. At what point should the officer have said, okay, you know, driver, I know you've got this expired instructor's license and don't have insurance, but at what point should the stop have ended and nothing else would have occurred with respect to your client? After she has admitted and he has confirmed in lien that she doesn't have the necessary documentation, he doesn't have any objective proof that Mr. Williams or anyone else is engaged in drug sales. You issue the ticket, and he goes on. So he was pulled out, and as all of this additional investigation was happening, Mr. Williams is asking the entire time, why am I standing out here? So that was the prolonged detention. I see your time has expired. Thank you. Thank you.